UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IVERSON INDUSTRIES, INC.

        Plaintiff,                                                Case Number 06-14835

v.                                                              Honorable David M. Lawson

METAL MANAGEMENT OHIO, INC.

        Defendant.
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The principal issue presented by the parties' cross motions for summary judgment now before the Court is whether there is evidence establishing an agreement to extend a contract for the purchase and sale of scrap metal beyond its express termination date. The motions present other issues as well, namely, whether the defendant breached the express contract by paying less than the prescribed contract formula for scrap metal and assessing a fuel surcharge during the contract term, whether the plaintiff's claim is barred by laches, whether the defendant is entitled to a setoff for payments in excess of the formula after the expiration of the express contract, and whether the defendant was unjustly enriched. The Court heard oral argument on these motions on November 26, 2007. The Court now finds that the plaintiff is entitled to summary judgment on its claim that the fuel surcharge was improperly imposed during the term of the express contract, fact issues preclude summary judgment for either party on the question whether the express contract was breached or extended, the doctrine of laches does not bar the plaintiff's claim, and the plaintiff's unjust enrichment claim cannot proceed. Therefore, the Court will grant each party's motion for summary judgment in part and deny them in part.

I.

The plaintiff, Iverson Industries, Inc., is an automotive materials and parts finisher that operates three facilities in southern Michigan. A byproduct of Iverson's precision machining operations is scrap metal in the form of shavings and solids from machine shop turnings and cast iron borings. There is a market for this industrial waste, and the defendant, Metal Management Ohio, Inc., is in the business of buying this type of scrap metal from manufacturers and selling it on the open market. According to the parties, Metal Management has been purchasing Iverson's scrap metal for the past ten years. Metal Management typically calculates the price it will pay for scrap metal each month according to the fluctuating market, taking into account its costs and a profit margin.

In 2002, Iverson and Metal Management entered into a contract whereby Iverson would sell all of its scrap metal from two of its Michigan plants exclusively to Metal Management, and in exchange Metal Management guaranteed its pricing according to a formula tied to an industry publication, *Iron Age Scrap Price Bulletin*, Detroit, which is printed monthly, with fixed adjustments. The pricing provision of the contract stated:

> The following formulas will be used to determine the value of each scrap commodity at your plants. All prices will be based on the *Iron Age Scrap Price Bulletin*, Detroit, high side pricing. Pricing is in dollars per gross ton (S/GT). FOB shipping point loaded MTLM Ohio container. (1 GT = 2240 lbs).
>
> | | |
> |---|---|
> | Steel Turnings | Machine shop turnings plus $4 |
> | Cast Iron Borings | Cast iron borings plus $12 |
> | Solids | Cupola cast minus $18 |
>
> The above pricing structure is the minimum you will receive, based on current production levels. The formulas can be changed at any time with mutual consent of both parties.

Compl. Ex. 1; Def.'s Mot. for Summ. J., Ex. 1. To facilitate the operation, Metal Management agreed to place its covered "rolloff boxes" at Iverson's two plants so that scrap could be deposited there by Iverson on site, and Metal Management could empty them regularly.

> The contract was for a fixed two-year term, which was measured as follows:
>
> This Scrap Agreement will be in effect for a period of two (2) years from the date the six (6) new rolloff boxes are put into service, and can be amended at any time with mutual consent of both parties.

*Ibid.* As are many of the facts in this case, the precise date the rolloff boxes were placed is in doubt, and neither party can furnish definitive proof on this point; but it appears that the parties agree that the rolloff boxes were delivered no earlier than September 2002 and no later than November 2002. Therefore, this contract would expire of its own terms no later than November 2004.

The parties have maintained their business relationship, even through the pendency of this lawsuit, but a dispute has arisen over Metal Management's pricing of the scrap metal it continues to purchase from Iverson. Iverson alleges that Metal Management departed from the contract pricing formula for some of the months in early 2004, and it added fuel surcharges that were unauthorized. Iverson also insists that the parties also engaged in a course of conduct that establishes an intent to continue, extend, or renew the contract and its formula pricing scheme well after the November 2004 expiration, and Metal Management breached this contract implied in fact by underpaying for scrap metal after 2004. There is no dispute that Metal Management regularly has picked up scrap metal from Iverson's two Michigan plants, delivered detailed statements each month documenting the quantity and price paid for each type of scrap metal, and issued monthly checks to Iverson throughout this period. However, Iverson did not bring its objections to light until July 2006.

The undisputed facts establish that beginning in 2003, Metal Management started deducting a fuel service charge from the price paid to Iverson. Metal Management deducted $197.62 for this charge in 2003, $2,050.60 in 2004, $3,995.09 in 2005, and $1,172.36 in 2006, for a total of $7,415.67. Although it is not clear how the fuel service charge was calculated, Metal Management claims that it imposed this charge on all customers consistent with the industry standard. The parties agree that Iverson otherwise was paid consistent with the contract throughout 2002-2004 (with some disparities during a few isolated months). Beginning in January 2005, it appears that Metal Management no longer paid under the contract formula.

However, it appears that both companies forgot about the 2002 contract. Iverson employee Marie Zak testified at her deposition that she began reviewing the Metal Management file in the spring of 2006 when she discovered that Metal Management was paying much less for scrap metal than Metal Management's competitor, Zalev Brothers, Co. Iverson began getting quotes from other scrap metal dealers. Ms. Zak then discovered that Iverson was being underpaid under the 2002 contract in June of 2006 when she "actually found the contract." Def.'s Resp. to Pl.'s Mot. for Summ. J., Ex. 2, Dep. of Marie Zak 23:16, July 10, 2007. Larry Finnell, CEO of Iverson, testified that he first became aware of the written contract (which apparently was signed before he became CEO) in 2006.

Metal Management had significant attrition in 2004 and periods of turmoil in upper management thereafter, which led to a gap in knowledge of how Iverson was being paid, or even which employee was handling the account. Christopher Beck was Metal Management's account executive assigned to Iverson's account until 2003 or 2004, and when he left, it is unclear who took over. David Hammer testified that he took over the account in early 2005 from "[n]o one." Pl.'s

Resp. to Def.'s Mot. for Summ. J., Ex. 5, Dep. of David Hammer 12:10, Sept. 7, 2007. He stated that "[t]here was a void on the Iverson account where accounting was looking for information, pricing . . . There was no information." *Id.* at 12:6-8. Mr. Hammer was unaware of the existence of the 2002 contract until the present lawsuit was filed, and he set prices each month based on the market accounting for expense in order to target a profit margin of $80 per gross ton. According to Mr. Hammer, approximately ninety percent of Metal Management's relationships are based on monthly pricing without a written contract, and half are priced unilaterally by Metal Management.

Mr. Hammer turned over the Iverson account to Alan Moll in early 2005. In July 2006, Iverson first complained to Metal Management about the prices it was being paid for its scrap metal. On August 2, 2006, David Hammer met with Marie Zak and Kenneth Pociask from Iverson to attempt to salvage the account, according to Hammer. Mr. Hammer offered to pay the difference from the contract back to April 2006, but he could not pay beyond that without authorization from upper management, which was not forthcoming. For future purchases, Mr. Hammer offered to "cut the margins to the bone and to a minimally acceptable margin." Def.'s Resp. to Pl.'s Mot. for Summ. J., Ex. 1, Aff. of David Hammer at ¶ 33. The parties continue to do business, although "margins being made [by Metal Management] on the current scrap purchases is way lower than the average margins acceptable to Metal Management's Defiance facility." *Ibid.*

No agreement was reached, however, and this lawsuit was commenced in October 2006. After discovery, the cross motions for summary judgment followed.

## II.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact." Fed. R. Civ. P. 56(c). The parties have filed cross motions for summary judgment, which might imply that there are no facts in dispute. Nonetheless, the Court must apply the well-recognized standards when deciding such cross motions; "[t]he fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate." *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003). Therefore, when this Court considers cross motions for summary judgment, it "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

A motion for summary judgment under Fed. R. Civ. P. 56 presumes the absence of a genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). When the "'record taken as a whole could not lead a rational trier of fact to find for the nonmoving party,'" there is no genuine issue of material fact. *Howard ex rel. Estate of Howard v. Bayes*, 457 F.3d 568, 571 ((6th Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991). It must be emphasized, however, that "[i]n evaluating the evidence, [the court] 'draw[s] all reasonable inferences therefrom

in a light most favorable to the non-moving party.'" *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003) (quoting *PDV Midwest Ref., L.L.C. v. Armada Oil & Gas Co*, 305 F.3d 498, 505 (6th Cir. 2002)).

The plaintiff has invoked this Court's diversity jurisdiction. In federal cases based upon diversity jurisdiction, the Court must apply the law of the forum state's highest court. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938). If the state's highest court has not decided an issue, then "the federal court must ascertain the state law from 'all relevant data.'" *Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir. 1995) (quoting *Bailey v. v. & O Press Co.*, 770 F.2d 601, 604 (6th Cir. 1985)). "Relevant data includes the state's intermediate appellate court decisions, as well as the state supreme court's relevant *dicta*, restatements of the law, law review commentaries, and the majority rule among other states." *Ososki v. St. Paul Surplus Lines*, 156 F. Supp. 2d 669, 674 (E.D. Mich. 2001) (internal quotes and citation omitted) (citing *Angelotta v. Am. Broad. Corp.*, 820 F.2d 806, 807 (6th Cir. 1987)).

There is no dispute by the parties that Michigan law governs in this case.

A.

At the center of this dispute is the question whether the 2002-2004 express contract's pricing scheme should be extended beyond the contract's stated two-year term. The plaintiff insists that it is entitled to summary judgment because the parties continued for a time after September 2004 to buy and sell scrap metal based on the price formula contained in the contract, which gives rise to a presumption that Metal Management cannot rebut due to its "knowledge void" in the early months of 2005. Metal Management, on the other hand, contends that it is entitled to summary judgment

based on the plain and explicit contract language, which states that the agreement expired after two years.

The parties' transactions in scrap metal is nothing more than a sale of goods, which in Michigan is governed by Article 2 of the Uniform Commercial Code. As adopted in Michigan, the UCC permits a contract to be formed "in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Mich. Comp. Laws § 440.2204(1). In this case, the parties continued to do business with each other after the contract expired, but on what terms? Section 2-208 of the UCC states that "any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement." Mich. Comp. Laws § 440.2208(1). However, that section also creates a hierarchy of evidence that establishes contract terms when performance is inconsistent with other proof, under which express contract provisions prevail over course of performance, which in turn prevails over custom and usage and trade practices. Mich. Comp. Laws § 440.2208(2) (stating that "[t]he express terms of the agreement and any such course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, express terms shall control course of performance and course of performance shall control both course of dealing and usage of trade (section 1205)"). Since the contract expressly expired after two years, for the plaintiff to be able to rely on the contract's pricing scheme, it must produce evidence to show a modification (i.e., an extension) of the two-year term or a renewal of the agreement. Section 2-208(3) states that "course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance." Mich. Comp. Laws § 440.2208(3).

These provisions are consistent with Michigan's common law, which "supplement [the UCC's] provisions." Mich. Comp. Laws § 440.1103; *Firwood Mfg. Co., Inc. v. General Tire, Inc.*, 96 F.3d 163, 172 (6th Cir. 1996). Under certain circumstances, Michigan law permits a contract to be renewed implicitly, such as in the case of fixed-term employment contracts. *See Paxson v. Cass County Rd. Comm'n*, 325 Mich. 276, 280-81, 38 N.W.2d 315, 317 (1949); *see also Sines v. Superintendents of the Poor*, 58 Mich. 503, 506-07, 25 N.W. 485, 487 (Mich. 1885). However, if the evidence suggests contrary intentions, a contract does not necessarily continue and is not implicitly renewed. *See Howell Elec. Light & Power Co. v. Village of Howell*, 132 Mich. 117, 120, 92 N.W. 940, 941 (1903) (stating that continued performance may imply an intent to renew, but "[i]f there be anything to show a contrary intention, the renewal of the contract for the stated period will not be inferred").

Under Michigan common law, "an implied-in-fact contract arises between parties when those parties show a mutual intention to contract." *Kingsley Associates, Inc. v. Moll PlastiCrafters, Inc.*, 65 F.3d 498, 504 (6th Cir. 1995). "A contract is implied in fact where the intention as to it is not manifested by direct or explicit words between the parties, but is to be gathered by implication or proper deduction from the conduct of the parties, language used or things done by them, or other pertinent circumstances attending the transaction." *Erickson v. Goodell Oil Co.*, 384 Mich. 207, 212, 180 N.W.2d 798, 800 (1970). "In deciding whether there was mutual assent to a[n implied contract term], [Michigan courts] use an objective test, 'looking to the expressed words of the parties and *their visible acts*.'" *Rowe v. Montgomery Ward & Co., Inc.*, 437 Mich. 627, 640, 473 N.W.2d 268, 273 (1991) (emphasis in original).

Michigan's statement of the controlling principle appears to be consistent with the prevailing view. For example, the Arkansas Supreme Court has written:

> When an agreement expires by its own terms, if without more the parties continue to perform as before, an implication arises that they have mutually assented to a new contract containing the same provisions as the old, and the existence of the new contract is determined by an "objective" test, i. e., whether a reasonable man would think, from the actions, that they intended to make a new binding agreement. In such a case, when the parties continue to do business together, their conduct may permit, or even constrain, a finding that they impliedly agree that their rights and obligations should continue to be measured as provided in the old contract.

*Steed v. Busby*, 268 Ark. 1, 7, 593 S.W.2d 34, 38 (1980) (citations omitted). Similarly, the New York Court of Appeals has explained:

> Where, after the expiration of a contract fixing the reciprocal rights and obligations of the parties, they continue to do business together, the conduct of the parties may at times permit, or even constrain, a finding that the parties impliedly agree that their rights and obligations in connection with such business should continue to be measured as provided in the old contract. Even in such case, however, the reciprocal obligations arise from the new implied contract and, unless an intent to make such a new contract is expressed or may be fairly inferred from the conduct of the parties, the obligations of the parties are as matter of law not measured by the terms of the contract which has expired.

*New York Telephone Co. v. Jamestown Telephone Corp.*, 282 N.Y. 365, 371, 26 N.E.2d 295, 297 (1940).

The plaintiff argues that evidence of continued performance creates a presumption of a contract extension, citing *Comenos v. Viacom Int'l, Inc.*, 857 F. Supp. 1160 (E.D. Mich. 1994). It is true that the court in *Comenos* appeared to treat the evidence of continued performance of an employment contract following its one-year expiration date as giving rise to a "presumption" that the defendant was obliged to "rebut" under New York law, which was applied in that case. However, a careful review of the basis of the court's choice of language reveals that evidence of continued performance under that State's laws establishes no presumption at all, but only a

-10-

permissible inference that the parties intended to continue the contract. The court stated: "As a general rule, under New York law, 'even where [an] agreement expires by its terms, if the parties continue to perform as before, an implication arises that they have mutually assented to a new contract containing the same provisions as the old.'" *Id.* at 1165 (quoting *Teachers Ins. & Annuity v. Ormesa Geothermal*, 791 F. Supp. 401, 415 n. 4 (S.D.N.Y. 1991)).

Similarly, the Court finds that the plaintiff here exaggerates the effect of such evidence and in doing so mischaracterizes the state of the law. There is no "presumption" that arises from post-expiration conduct that is consistent with the terms of the contract. Rather, the cases state that an "implication" arises from which the parties' intent to continue the contract "may" be inferred. The inference of an intent to continue or renew a contract is not mandatory, and there is no shift in the burden to proof the intent of the parties to contract. Rather, to create or modify a contract, there must be a meeting of the minds. *Port Huron Educ. Ass'n. v. Port Huron Area School Dist.*, 452 Mich. 309, 326-27, 550 N.W.2d 228, 238 (1996) (citing *Universal Leaseway Sys., Inc. v. Herrud & Co.*, 366 Mich. 473, 115 N.W.2d 294 (1962)). The plaintiff bears the burden of proving the existence of a contract. *Lambert v. Jim Causley Pontiac, Inc.*, 47 Mich. App. 620, 622, 209 N.W.2d 619, 619-20 (1973).

Where, as here, there is contrary evidence, it must be left to the fact finder to decide whether the *permissible* inference that results from such consistent conduct establishes a contract implied in fact. In the plaintiff's favor there is proof that for a few months after September 2004 Metal Management paid the formula price for scrap metal. However, weighing against the plaintiff's position is the fact that the actual expiration date of the contract may have been as late as November 2004, thereafter neither party recalled that the contract existed until it was discovered by Iverson's

staff in the summer of 2006, Metal Management's reversion to market pricing in the early months of 2005, and Metal Management's lack of awareness of a prior contract from the time David Hammer took over the account in mid 2005. Continuation of formula pricing for two or three months certainly does not create an iron-clad inference that the contract was renewed; and if neither party knew there even was a contract, it would be difficult to construct an inference that the parties mutually agreed to continue to be bound by it.

Because there are facts from which a fact finder could infer an intent to continue the contract beyond its expiration date, the defendant cannot prevail on this point as a matter of law. Similarly, because there are facts that cast considerable doubt on the proposition that the parties mutually intended to continue the contract beyond November of 2004, the plaintiff is not entitled to summary judgment on its contract-implied-in-fact theory.

The defendant contends that the plaintiff's implied-in-fact theory must yield to the Statute of Frauds. The statute of fraud states that "a contract for the sale of goods for the price of $1,000.00 or more is not enforceable . . . unless there is a writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought." Mich. Comp. Laws § 440.2201(1). There is an exception "[w]ith respect to goods for which payment has been made and accepted or that have been received and accepted under [Mich. Comp. Laws § 440.]2606." Mich. Comp. Laws § 440.2201(3)(c). In this case, the performance of the parties confirmed the existence of an agreement for the sale of scrap metal. The dispute centers on the price term. The Statute of Frauds does not bar that claim as a matter of law.

The defendant also contends that the plaintiff's claim is barred by the doctrine of laches. Under Michigan law, laches requires "a lack of due diligence on the part of the plaintiff resulting

in some prejudice to the defendant." *Gallagher v. Keefe*, 232 Mich. App. 363, 369, 591 N.W.2d 297, 300 (1998); *see also Brown v. State, Dept. of Military Affairs*, 386 Mich. 194, 199, 191 N.W.2d 347, 350 (1971). The doctrine reflects "'the exercise of the reserved power of equity to withhold relief otherwise regularly given whether in the particular case the granting of such relief would be unfair and unjust.'" *Lothian v. Detroit*, 414 Mich. 160, 168, 324 N.W.2d 9, 14 (1982), quoting Walsh, Equity, § 102, p 472. The Sixth Circuit recently elaborated on the concept of laches:

> In this circuit, laches is understood to be "a negligent and unintentional failure to protect one's rights." *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir.1991). "A party asserting laches must show: (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it." *Herman Miller, Inc. v. Palazzetti Imports and Exports, Inc.*, 270 F.3d 298, 320 (6th Cir.2001). Thus:
>
>> [L]aches does not result from a mere lapse of time but from the fact that, during the lapse of time, changed circumstances inequitably work to the disadvantage or prejudice of another if the claim is now to be enforced. By his negligent delay, the plaintiff may have misled the defendant or others into acting on the assumption that the plaintiff has abandoned his claim, or that he acquiesces in the situation, or changed circumstances may make it more difficult to defend against the claim.
>
> 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 2946 at 117 (2d ed.1995) (quoting de Funiak, Handbook of Modern Equity § 24 at 41 (2d ed.1956)).

*Chirco v. Crosswinds Communities, Inc.*, 474 F.3d 227, 231 (6th Cir. 2007).

The defendant in this case has not shown that it changed its position in reliance on the plaintiff's failure to assert its rights under the contract, or that it may be more difficult to defend against the claim that the parties intended to continue their agreement as to pricing. Moreover, the plaintiff has brought its action within the allowable statute of limitation for such claims. *See* Mich. Comp. Laws § 440.2725(1) ("An action for breach of any contract for sale must be commenced within 4 years after the cause of action has accrued."). Laches does not bar the plaintiff's claim.

The Court concludes, therefore, that neither party is entitled to summary judgment on the plaintiff's claim that formula pricing should have been maintained after the written contract expired by its express terms two years after it went into effect.

B.

The plaintiff also contends that it was underpaid throughout 2002 and 2003 because the defendant did not follow the formula pricing schedule during some of the months when the contract was in effect. The defendant did not respond to the specific claims on a month-by-month basis because the plaintiff only raised the argument for the first time in a footnote in its final Reply Brief. *See* Pl.'s Reply Br. 1, n. 1. Rather, in its initial motion for summary judgment, the plaintiff merely stated that it was investigating whether there was an underpayment during this period. It believes that it was underpaid $9,357.87 in 2002 and 2003. However, it has not pointed to anything in the record that supports this claim.

The plaintiff has also claimed that it was underpaid in 2004 by $19,777.73, not counting the fuel service charges. It relies on a printout of a spreadsheet prepared by Marie Zak for this amount. The plaintiff argues that, although the amount of damages remains contested, the Court can issue summary judgment on liability.

The defendant has not replied to the argument about 2002 and 2003 because the argument was first advanced in the plaintiff's final brief. However, the defendant believes that it actually paid more than the contract price during 2004, and points to Mr. Hammer's affidavit and accompanying spreadsheet.

It is apparent that a fact issue is presented here. The Court therefore will deny the plaintiff's motion for summary judgment on this aspect of its claim.

C.

The plaintiff also argues that the defendant's act of reducing its payment for a fuel service charge breached the contract, because the contract contains no provision allowing such charges. The defendant argues that the 2002 contract is silent as to fuel service charges, and therefore does not preclude what is widely practiced in the industry.

The 2002 contract explicitly sets forth the price terms. It contains no allowance for an adjustment for a fuel surcharge. Although industry practice may be relevant to show that a fuel surcharge became part of the agreement to set prices according to market conditions, as the defendant claims was done after the 2002 contract expired, the provisions of the UCC set forth above doe not permit a contract modification based on industry practice that is inconsistent with the parties' express agreement. Mich. Comp. Laws § 440.2208. To be sure, "course of performance shall be relevant to show a waiver or modification of any term." Mich. Comp. Laws § 440.2208(3). However, "'a waiver is a voluntary and intentional abandonment of a known right.'" *Johnson Controls, Inc. v. Jay Industries, Inc.*, 459 F.3d 717, 725 (6th Cir. 2006) (quoting *Quality Prods. & Concepts, Co. v. Nagel Precision, Inc.*, 469 Mich. 362, 666 N.W.2d 251, 258 (Mich. 2003)). And although course of conduct can constitute a waiver, there must be "evidence that [the other party] intentionally relinquished its rights." *Ibid.*

There is no evidence that the plaintiff intentionally waived its right to the pricing schedule set forth in the contract during the two-year term. The defendant's adjustment of the price it paid for scrap metal for the increased cost of fuel during that period breached the express terms of the contract. Therefore, the plaintiff is entitled to summary judgment on its claim that the defendant underpaid it during the two-year term of the 2002 contract. As noted above, there is a dispute as to

-15-

when the roll-off boxes were placed, and therefore the Court cannot determine with precision when the express contract began and ended as a matter of law. However, the parties do agree that the roll-off boxes were placed no earlier than September 6, 2002, making the earliest contractual expiration date September 6, 2004. Thus, the plaintiff is entitled to damages in the amount of $197.62 for the fuel surcharge in 2003, and $1,094.41 for the fuel surcharge for January through September 6, 2004. Whether the plaintiff is entitled to payment for the fuel surcharge underpayment in October and November 2004 must abide a determination at trial.

D.

Finally, the defendant contends that it is entitled to summary judgment on the plaintiff's unjust enrichment claim. "Whether a specific party has been unjustly enriched is generally a question of fact . . . [however,] whether a claim for unjust enrichment can be maintained is a question of law." *Morris Pumps v. Centerline Piping, Inc.*, 273 Mich. App. 187, 193, 729 N.W.2d 898, 903 (2006), *appeal denied*, 740 N.W.2d 200 (Mich. 2007). "Under Michigan law, the elements of an unjust enrichment claim are '(1) receipt of a benefit by the defendant from the plaintiff and, (2) which benefit it is inequitable that the defendant retain.'" *Wysong Corp. v. M.I. Industries*, 412 F. Supp. 2d 612, 624-24 (E.D. Mich. 2005) (quoting *Dumas v. Auto Club Ins. Ass'n*, 437 Mich. 521, 546, 473 N.W.2d 652, 663 (1991)). There is no claim for unjust enrichment when there exists a valid contract covering the same subject matter. *Morris*, 273 Mich. App. at 195, 729 N.W.2d at 904.

The defendant contends that it paid the market rate for the metal, and the plaintiff has not countered this contention. The only evidence offered by the plaintiff is Ms. Zak's realization that another company was paying a higher price for scrap metal. This evidence fails to establish that the low price paid led to an inequitable benefit to the defendant.

Moreover, even if the defendant underpaid, there is no allegation of inequitable conduct that would render the low payment actionable. There is no claim that the defendant took more scrap metal than claimed or was fraudulent in hiding its price. To the contrary, the defendant provided the plaintiff with documentation of its pricing each month. The plaintiff has not explained why it was inequitable for the defendant to pay the prices it did, except under the implicit theory that the plaintiff was entitled to the 2002 contract price. This analysis is inapplicable to an unjust enrichment claim, which cannot be brought if there is a contract covering the subject matter. Summary judgment for the defendant is appropriate on this count.

III.

The Court finds that the plaintiff is entitled to summary judgment on its claim that it was undercharged for scrap metal in 2003 and 2004 by the amount of the fuel surcharge. The defendant is entitled to summary judgment on the plaintiff's unjust enrichment claim. Fact questions preclude summary judgment for either side on the remaining arguments.

Accordingly, it is **ORDERED** that the plaintiff's motion for summary judgment [dkt #21] is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that the defendant's motion for summary judgment [dkt #20] is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that the plaintiff may recover from the defendant the amount of underpayment for the fuel surcharge of $197.62 in 2003 and $$1,094.41 in 2004.

It is further **ORDERED** that count three of the plaintiff's complaint alleging unjust enrichment is **DISMISSED WITH PREJUDICE**.

s/David M. Lawson
DAVID M. LAWSON

United States District Judge

Dated: December 4, 2007

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on December 4, 2007.

                        s/Felicia M. Moses
                        FELICIA M. MOSES